**Dated: December 29, 2017**

**The following is ORDERED:**



TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

In re:
STEPHEN LEE COSTIGAN,          Case No: 16-80583-TRC
                                           Chapter 7

                Debtor.

AVB BANK,

                Plaintiff

v.                                                         Adv. No. 16-8019-TRC

STEPHEN LEE COSTIGAN,

                Defendant.

### MEMORANDUM OPINION

Plaintiff AVB Bank ("AVB") seeks a determination that Defendant Stephen Lee Costigan should be denied a discharge of his debts pursuant to 11 U.S.C. § 727(a)(4), or, alternatively, that his debt to AVB should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). A trial on the merits was held jointly with AVB's adversary

case against Costigan's ex-wife, Elsie M. Costigan, Adv. Case No. 16-8013-TRC.  After careful review of the testimony and exhibits admitted, as well as the relevant legal arguments and authority, the Court finds that AVB has met its burden of proof, and Stephen Lee Costigan's discharge is denied.

**Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

**Findings of Fact**

After weighing the evidence, stipulations of the parties, and considering the credibility of the witnesses, the Court makes the following findings of fact.

Stephen and Elsie Costigan were married for nearly thirty years.  Stephen worked in a variety jobs, including working offshore for Exon Mobil, competing as a professional fisherman on the bass tournament circuit, operating a small business from their garage, and working for a manufacturing business.  Elsie Costigan worked in offices of a millwork company and a manufacturing company.  She also obtained a real estate license.  In 2002 or 2003, the Costigans began SC Piping & Mechanical, Inc. ("SC Piping"),  a manufacturing business that fabricated boilers and heat exchangers for the petrochemical and oil and gas industries. SC Piping's customers included Exon Mobil, General Chemical, Citgo, Zeeco, John Zink, and many others. Its corporate office was located in Wagoner, Oklahoma.  Stephen Costigan was president.  Elsie Costigan was secretary and vice-president.  Eventually, they each became 50/50 owners of SC Piping.  Stephen and Elsie performed many duties for SC Piping.  Stephen made contacts with customers, prepared quotes and bids for projects, and oversaw manufacturing work.  Elsie managed the business office, prepared invoices, oversaw human resources issues, kept daily

books and records using QuickBooks accounting software, and assembled financial records for SC Piping's accountants. During the height of its operations, SC Piping had approximately 55 employees. In 2012, SC Piping had income of $2,517,142; in 2013 its income dropped to $1,574,145; and by 2014 income had decreased to $500,408.41. The Costigans also operated a related business, SC Enterprises, which was founded in 2007 or 2008 to manufacture fittings for the oil and gas industry. SC Enterprises was sold to CWH Resources, Inc. prior to the bankruptcy and appointment of a receiver for SC Piping.

SC Piping borrowed money from various banks, including AVB. The earliest record presented to the Court of an AVB loan to SC Piping is from 2004. Information regarding two loans was presented to the Court in this case. One promissory note and commercial security agreement was executed April 21, 2010 for $396,787.49. These funds were borrowed so that SC Piping could enlarge its manufacturing facility. The other note and commercial security agreement was executed March 29, 2012 for $486,917.80. These funds were used to purchase equipment from a company that was going out of business. SC Piping also used funds from both loans for general operations. AVB perfected its security interest by filing UCC-1 financing statements with the Oklahoma County Clerk. Stephen and Elsie each personally guaranteed SC Piping's obligations under the notes and commercial security agreements. AVB's representative, Brian Ferrell, testified that at the time the loans were made, the value of the collateral securing the promissory notes was sufficient to fully secure the loans to SC Piping.

AVB's loans were made on the basis of financial statements of SC Piping, as well as personal financial statements submitted by the Costigans. The commercial security agreements granted AVB a security interest in all accounts, equipment, inventory, and general intangibles then owned or acquired later, including monies arising from the sale of collateral ("the

collateral"). These agreements also prohibited borrowers from disposing of collateral without AVB's consent, and provided that "all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; . . . ." SC Piping made timely payments to AVB for many years.

In November of 2013, AVB hired Dakil Auctioneers, Inc. to inspect and appraise the equipment and furnishings located at SC Piping's building on South Main St., in Wagoner. Dakil prepared a ten page inventory of the equipment, and appraised the inventory at $ 300,000. Stephen was not present when Louis Dakil inspected and photographed the equipment. Stephen stated that some of the items Dakil listed were not actually owned by SC Piping but were owned by SC Enterprises.

By 2014, the Costigan's business and marriage collapsed. Business income was insufficient to make timely payments on SC Piping's debt to AVB. Elsie sent checks on behalf of SC Piping when funds were available, but these payments were late, and SC Piping defaulted on its obligations to AVB on May 14, 2014. Stephen believed that the company was able to generate sufficient income to service the debt owed to AVB. Stephen blamed AVB for the demise of SC Piping because AVB called one of the notes and he was not able to pay off the entire debt.

On June 11, 2014, AVB filed a foreclosure action in Wagoner County, Oklahoma District Court, Case No. CJ 2014-0203, against SC Piping and the Costigans individually, and requested the appointment of a receiver. AVB's was awarded a judgment against SC Piping and the Costigans totaling approximately $ 1.2 million. On June 19, 2014, the Costigans' divorce decree was entered and the marital property was divided between them. Property awarded to Stephen included: a 2009 GMC Denali, a 2004 Wander Camper, a 2007 Harley Davidson, a Kubota

tractor with attachments, weld machines with trailer and miscellaneous tools, a tiller/sprayer, guns, a pool table, and exercise equipment.

SC Piping filed a chapter 11 bankruptcy in this district on July 24, 2014, which stayed the state court action. SC Piping's bankruptcy was dismissed August 27, 2014, and the state court action resumed. On September 29, 2014, AVB's motion to appoint a state court receiver was granted. On October 7, 2014, Bill Koehler was appointed as receiver for SC Piping, taking control of the business operations, real and personal property. Koehler made a general inspection of SC Piping's facility in Wagoner before leaving on vacation. He met with Stephen and Elsie and instructed them to cease any operations they were involved in, took pictures of equipment, and took control of the books and records and computers. Elsie informed him that the utilities were in imminent danger of being cutoff for nonpayment. Koehler opened a new utilities account in order to continue utility services to SC Piping's facility. He determined that no workers' compensation or general liability insurance was in place, and that there were no pending work orders or accounts receivable. Stephen informed Koehler that SC Piping was in the middle of a job manufacturing pipe flanges for CWH Resources, LLC ("CWH Resources"). Koehler understood that a separate company had rented part of SC Piping's building and was working on the pipe flanges project. Koehler allowed that operation to continue until he returned from vacation the following week. He did not authorize anyone to remove equipment from the SC Piping premises.

While Koehler was vacationing out of state, the utilities were cutoff to the SC Piping building. Since Koehler had given permission for the pipe flange project to continue, Stephen took it upon himself to move equipment from SC Piping's premises to another building on the south side of Wagoner on Highway 69 so that the project could be completed. Stephen claimed

he called Koehler to ask permission, but Koehler did not answer. Koehler claimed he did not receive any calls from Stephen. Stephen moved equipment owned by CWH Resources LLC so that the project could be completed. He also moved some of SC Piping's equipment because the equipment was needed to complete the project for CWH Resources.[1] He testified that "we" had a job in progress that needed to be completed, but also stated that he spearheaded the moving of equipment an completion of the job as a favor to CWH. He claimed he received no financial benefit for this work.

Once Koehler returned from vacation and visited SC Piping, he realized equipment was missing. Persons affiliated with SC Piping confirmed to Koehler that Stephen had removed equipment. Stephen did not notify Koehler that he had removed the equipment nor where he had it moved. Koehler found the missing equipment by following Stephen (without Stephen's knowledge) to the new location. Koehler enlisted the help of police officers to inspect the Highway 69 premises for the missing equipment. Koehler hired a heavy equipment mover to move one large piece of equipment back to SC Piping's building, and hired two individuals to move back the rest of the equipment. Koehler believed that not all equipment was located and returned to SC Piping. According to Stephen, all equipment owned by SC Piping was returned to Koehler. However, Stephen claimed that some of the equipment he removed from SC Piping's premises was owned by CWH Resources, the company that had purchased SC Enterprises. Stephen did not return CWH Resource's equipment to Koehler.

---

[1] During his 2004 exam, Stephen testified that he did not move any equipment belonging to SC Piping, but only moved equipment that CWH had purchased from SC Enterprises. At trial, he testified that he removed equipment of CWH and of SC Piping but returned all of the SC Piping equipment to Koehler.

In reviewing SC Piping's books and records, Koehler learned about other businesses operated by the Costigans, including SC Enterprises and SC Fabrication.[2] He observed that the Costigans did little to keep business operations and accounts separate. He found the business records to be in disarray, and believed that the business records were designed to hide the true operations of the businesses and ownership of assets. Records were maintained using QuickBooks accounting software. Koehler discovered that the accounting system was corrupted, and he hired an IT professional to recover business records. Koehler described the Costigans as hostile and uncooperative.

Stephen filed a motion to remove Koehler as receiver, which was denied. Koehler filed a motion for accounting and turnover of property. He relied on the November, 2013 Dakil inventory list to determine what property had been removed from SC Piping by Stephen. He also found information in SC Piping's records indicating that a 2006 Cargo Mate trailer purchased in 2006 was missing. Koehler asked the state court to order Stephen to turnover the missing equipment, listing over thirty items and categories of items that were missing. Koehler also obtained an order allowing him to sell the assets he did recover at public auction conducted by Dakil Auctioneers, Inc, with the exception of a few items that CWH claimed it owned, and some personal items owned by Stephen. Stephen told this Court that some of the items that Koehler identified as missing were not missing because Stephen purchased them at the SC Piping auction. Stephen stated that he bought the items on behalf of another person or a newly-created company he was involved with named DevCon LLC. No auction tickets were produced to verify Stephen's claims. Ultimately, Koehler collected approximately $ 181,000 from the sale of SC

---

[2] Stephen testified that he created SC Fabrication after SC Piping was taken over by the receiver. SC Fabrication completed just one job.

Piping assets which was applied to AVB's judgment. Koehler believed that he never recovered all of the assets of SC Piping that were removed by Stephen. Koehler specifically identified a Cargo Mate trailer, and two flatbed trailers with "SC Piping" painted on the sides that were never recovered. He estimated the value of each of these items at $ 2,000 to $ 2,500.

DevCon, LLC ("DevCon") was created in March of 2015, in the midst of SC Piping's receivership. At trial, Stephen described DevCon as a new company that was created to perform the same work as SC Piping, and was located on Highway 69 in Wagoner. Stephen was President of DevCon and John Mayes, a former customer of SC Piping, was vice-president. According to Stephen, John owned 100% of DevCon.[3] Stephen stated that DevCon ceased to exist when it was unable to get a zoning change required to conduct manufacturing operations at the location it intended to occupy. Stephen never received a salary from DevCon, but he did secure loans from Armstrong Bank under the name of Stephen Costigan, d/b/a DevCon, LLC. His first loan was on September 16, 2015, for $ 90,595.99. His second loan was on November 5, 2015, for $ 15,169.00. For each loan Stephen signed a promissory note, a commercial security agreement and a business loan agreement which listed the borrower and signatory as "Stephen Costigan dba DevCon LLC". Armstrong Bank filed UCC-1 statements with the Oklahoma County Clerk for each loan, identifying the borrower as Stephen Costigan dba Devcon LLC, and listed the collateral as all inventory, equipment, accounts receivable and general intangibles of DevCon LLC. Stephen testified that the "dba DevCon LLC" designation on the loan documents was a mistake, that he informed Armstrong's loan officer of the mistake, and that these were personal loans to him.

---

[3] AVB submitted a page dated May 3, 2017 from the LinkedIn website identifying Steve Costigan as President of DevCon LLC.

Stephen Costigan filed his individual chapter 7 case on June 11, 2016.[4] He listed AVB's total claim as $ 1,148,932.90, with $ 952,258.00 being unsecured. Among the items of personal property listed in Schedule A/B, Stephen included four firearms and a 2007 Harley-Davidson motorcycle.[5] In his Statement of Financial Affairs, Stephen answered "No" to questions of whether he was holding property for another, and whether he stored property in a storage unit within 1 year before filing. In Part 7, question 18, regarding any sales, trades or transfers of property made within 2 years before filing, Stephen identified a $50,000 payment to Elsie Costigan (made with funds borrowed from John Mayes) in exchange for a quitclaim deed related to their home and divorce settlement, and a trade-in of a 2015 GMC Denali for $40,000 in credit to purchase a 2008 GMC Sierra. He did not include any other personal property transferred as a result of the divorce decree dated June 19, 2014. Stephen disclosed his 100% ownership interest in SC Fabrication Inc. In his Statement of Financial Affairs, Part 11 regarding details about businesses or connections to any business, Stephen listed SC Piping, SC Fabrication, Inc., and SC Enterprises, Inc.[6] Although he was required to disclose any corporation in which he was an officer, director or managing executive, he did not disclose his affiliation with DevCon LLC, nor did he list any income derived from DevCon LLC or assets of DevCon LLC he was holding.

---

[4] Elsie Costigan filed chapter 7 bankruptcy on March 28, 2016.

[5] The parties stipulated that Stephen had been awarded all guns and a 2007 Harley-Davidson motorcycle in the June 19, 2014 Divorce Decree. The parties also stipulated that the only items awarded to Stephen in the divorce decree that were included in his bankruptcy Petition were four guns. However, Page 11 of Schedule A/B lists a 2007 Harley-Davidson.

[6] The parties stipulated to this fact in the Pretrial Order. However, AVB stated in its Trial Brief that Stephen Costigan did not list separate businesses such as SC Piping, SC Fabrications, SC Enterprises, or DevCon, in his Petition.

The Chapter 7 Trustee and AVB conducted a 2004 exam of Stephen on September 15, 2016. He admitted holding himself out as an employee of DevCon LLC, stating that he served as the general manager and John Mayes was the quality control inspector. He denied borrowing any money on behalf of DevCon LLC, or signing any loan documents with any bank on behalf of DevCon LLC. He admitted that DevCon LLC had a storage unit, that he paid the monthly rental payments, and that he possessed the key to the storage unit. Stephen also stated that the items in the storage unit had been purchased by him or another man on behalf of John Mayes at the SC Piping auction. The storage unit contained office equipment, fiberglass molds, and fiberglass guns and holsters. He also admitted that he had more guns than he listed on his schedules, and that he had possession of another person's pool table.

On September 22, 2016, Stephen filed an Amended Statement of Financial Affairs to include additional transfers in Part 7, question 18. In addition to the two transfers he listed in the original Statement of Financial Affairs made within 2 years of filing bankruptcy, Stephen included the transfer of a 2004 Camper to an unknown buyer for $ 2,000, the transfer of a Kubota tractor with miscellaneous attachments and a welding machine on an unspecified date in 2014 for $ 15,000, and the sale of a bass boat to an unknown buyer for $ 28,000 in January of 2014.[7]

At trial, Stephen testified that he understood the necessity of full disclosure in his bankruptcy petition and schedules. He knew that he signed court documents under penalty of perjury and told the Court that he filled out the schedules to the best of his ability. Stephen denied having a storage unit at the time he filed bankruptcy, claiming that it was DevCon LLC's unit and DevCon LLC's property in the unit. He did not list this in his bankruptcy petition.

---

[7] During his 2004 exam, Stephen was unable to recall the sale date of the bass boat, and whether it was before or after the entry of the divorce decree.

However, he also testified that he had some personal property in the storage unit due to his divorce. He admitted that he had possession of his brother's pool table, and several guns owned by his stepson that were never disclosed in his Statement of Financial Affairs. He testified that he sold the Kubota tractor before bankruptcy because he needed money to live on. He did not remember when he sold the tractor but he did remember to whom he sold it, the equipment and attachments that he sold with the tractor, and that he sold it for approximately $15,000. He sold a camper for approximately $2,000 but did not recall to whom or when it was sold. He also sold a bass boat for $28,000 sometime near the time of his divorce, but he could not recall the exact date.

**Conclusions of Law**

A discharge of debts through bankruptcy results in "a completely unencumbered new beginning."[8] This "fresh start" is limited to the "honest but unfortunate debtor."[9] The protections of the Bankruptcy Code are to be construed liberally in favor of the debtor and strictly against the creditor; thus grounds for denying a discharge are to be narrowly construed.[10] The party objecting to discharge has the burden of proving by a preponderance of the evidence that grounds exist supporting the denial.[11]

AVB seeks to deny Stephen a discharge pursuant to § 727(a)(4)(A). Debtors have a duty to carefully, completely and accurately prepare schedules. The purpose of § 727(a)(4) is to

---

[8] *Grogan v. Garner*, 498 U.S. 279 (1991).

[9] *Id*.

[10] *See In re Kallstrom*, 298 B.R. 753 (10th Cir. BAP 2003).

[11] Fed. R. Bankr. P. 4005; *Mathai v. Warren (In re Warren)*, 512 F.3d 1241 (10th Cir. 2008); *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156 (10th Cir. 1991).

enforce this duty. A debtor must provide sufficient information and details to enable the trustee to determine whether to investigate further.[12] To deny a discharge under this section, a court must determine that the debtor acted knowingly and fraudulently in making a statement or omission under oath, and that the statement or omission is material to the case. A fact is material if it bears a relationship to debtor's business transactions, or concerns discovery of assets, or existence or disposition of property. "This standard of materiality has a low threshold."[13] Even an asset of little to no value may be material.[14] In determining fraudulent intent, courts look to the facts and circumstances of each case.[15] Omitting assets from the debtor's schedules or making a false statement at 341 meeting or a 2004 exam may constitute a false oath. A false statement based upon a mere mistake or inadvertence is insufficient to deny a discharge.

AVB argues that Stephen knowingly and fraudulently made a false oath or account and withheld information from his bankruptcy schedules regarding assets, the condition and location of its collateral, and his connection to DevCon. The Court finds that AVB established a prima facie case objecting to Stephen's discharge and met its burden to deny discharge by a preponderance of the evidence. Stephen failed to provide a satisfactory explanation or evidence that his omissions were not intentional but simply inadvertent or based upon a mere mistake. Although Stephen did not believe his omissions to be material, the Court finds that they met the

---

[12] *Hermann v. Hartford Casualty Insurance Co.*, 675 Fed. Appx. 856, 860 (10th Cir. 2017)(unpublished), citing *Payne v. Wood*, 775 F.2d 202, 205-206 (7th Cir. 1985).

[13] *In re Kidd*, 2015 WL 6437480, *9, (10th Cir. BAP Oct. 23, 2015)(unpublished).

[14] *In re Brown*, 108 F.3d 1290 (10th Cir. 1997).

[15] *In re Calder*, 907 F.2d 953 (10th Cir. 1990).

threshold for materiality. Stephen was not completely honest about his assets, about transfers he made, about his business dealings, or about disposition of property.

Much of Stephen's testimony was not credible. His testimony was confusing and contradictory, and his answers were often evasive. The Court believes that this was intentional and designed to obfuscate the truth. Stephen's testimony that he simply forgot about sales of collateral, including the trailer, the Kubota tractor and equipment, and the bass boat, and therefore did not list the transfers is not credible. Although he downplayed his knowledge of his companies' accounting and financial records, he was very knowledgeable about all equipment owned and used in his businesses. He recalled detailed information going back approximately twenty years regarding the financing and refinancing provided by at least four different lenders on many pieces of equipment. He prepared bids and secured jobs with very large companies. He developed and built several different companies, and managed to turn a small business operating out of his garage into a multi-million dollar operation. To this Court, he appeared as an intelligent and sophisticated businessman, certainly one who knew the specific and intimate details of his business operations, including the manufacturing process, the bidding process, and the financing process.

The evidence before the Court reflects numerous purchases of equipment, and vehicles, numerous financing agreements, and multiple businesses operated simultaneously. At times, Stephen recalled detailed information. At other times, he said he couldn't remember. He offered to review four single-spaced pages of inventory and equipment listed from the Dakil appraisal in 2013 and said that he was able to remember whether SC Piping or SC Enterprises owned the item, where the item was located when the receivership was imposed in the fall of 2014, whether the item was moved to the Highway 69 location, whether it was returned to SC Piping's location,

and whether it was on the auction list in 2015. However, when he filed bankruptcy in 2016, Stephen did not remember that he had more than four guns, that he held property for another including a pool table, that he had sold a Kubota tractor with implements for $ 15,000, had sold a bass boat for $ 28,000 so that he could have money to live on, nor did he remember he had the keys and made the monthly payments on a storage unit supposedly belonging to DevCon, or that his personal items were in the storage unit.

Stephen admitted that he omitted details from his bankruptcy petition, but explained that the omissions were inadvertent and immaterial, particularly the transfers made to him as a result of his divorce. It is tempting to agree with him based upon his rationale that he really didn't consider them to be transfers because he and Elsie were simply dividing joint property due to their divorce. However, he omitted other assets and transfers, as well as his involvement with DevCon. In a rare moment of candor, he admitted to the Court that he sold the bass boat because he needed money to live on, but did not think it important to include in his bankruptcy schedules. The Court believes that he intentionally omitted those items to conceal the fact that he had sold personal assets as well as collateral and pocketed some of the proceeds to avoid giving notice to the bankruptcy trustee and his creditors. He did not consider a few thousand dollars to be a significant amount of money. As noted by Koehler, the books and records of SC Piping indicated that Stephen's business dealings and operations were designed to hide assets and shift them amongst his various operations to his benefit and to the detriment of his creditors. His actions with Koehler during SC Piping's receivership were consistent with his actions in bankruptcy. He removed equipment without properly accounting for it, claiming it belonged to someone else or another entity. The Court believes that he used the businesses he created to shift assets and avoid claims of secured creditors to those assets.

Stephen was confronted with numerous inconsistencies between the evidence of his business dealings, his testimony at his 2004 exam, and his bankruptcy schedules and Statement of Financial Affairs. When asked to recall specific dates of when he sold assets, he was unable to do so, but he was able to recall specific information about the sales price, the buyer, and the pieces of equipment and implements that were sold. After being questioned at his 2004 exam and confronted about particular items, Stephen did amend his Statement of Financial Affairs to add guns and transfers of the Kubota tractor and implements and the bass boat. He did not adequately or satisfactorily explain to the Court why he failed to list them in his original Statement of Financial Affairs, other than to state that he did not consider the sales and transfers to be of great value. Simply filing amended schedules does not necessarily cure the filing of original schedules that were not truthful.[16]

His testimony about his involvement with DevCon was evasive and self-serving. He took out loans with Armstrong Bank under his name "dba DevCon LLC." This was simply a mistake, he said, claiming that he never told Armstrong Bank about his position as President of DevCon. He had no explanation for how Armstrong knew about DevCon and styled the loans as Stephen Costigan dba DevCon LLC. In fact, he claimed that he did not find out that he was being identified as president of DevCon until a few months before this trial. He claimed that these were both personal loans to him and were unrelated to DevCon. It appears that he listed one of the "dba DevCon LLC" loans as a personal loan on his schedules but another "dba DevCon" loan was listed as a joint debt. Neither included the "dba DevCon LLC" designation. Even if he did

---

[16] *See Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985): "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. The omission of assets may be a good reason to deny or revoke a discharge."

disclose the loans, he never referenced the DevCon connection in his bankruptcy schedules or Statement of Financial Affairs or Amended Statement. His explanation was that it was insignificant because the business had no operations. The Court believes, however, that this was an interest he did not want his creditors to know about. He should have included it in his schedules for notice purposes, and should have disclosed that he had possession and control of the storage unit and was making payments on that unit.

These omissions do not appear innocent or immaterial. Although the dollar amount of the items he omitted may have been negligible to Stephen, it is not up to the debtor to determine whether something is too insignificant to require disclosure and whether they were immaterial. His stated intention was to recreate his business under a new name, and the evidence established a pattern of omission. The Court does not believe his claim that he did not intentionally or deliberately conceal information from his creditors. Therefore, the Court finds that his discharge should be denied. Because the Court finds his discharged is denied, it need not address AVB's alternative claims under § 523.

## Conclusion

AVB Bank sustained its burden of proving that Stephen Costigan's discharge should be denied pursuant to § 727(a)(4)(A). A separate judgment shall be entered contemporaneously herewith.

###